### R. L. CHAMBERS v. DALLAS CONSOLIDATED ELECTRIC STREET RAILWAY COMPANY.

Decided June 5, 1909.

**Contributory Negligence—Street Railway—Collision at Crossing.**

In an action against a street railway company for injuries to a horse in a collision with a car at a street crossing, evidence considered, and held not to establish contributory negligence, as a matter of law, on the part of plaintiff in riding the horse upon the track.

Appeal from the County Court of Dallas County at law. Tried below before Hon. W. M. Holland.

*Charles M. Meng,* for appellant.

*Baker, Botts, Parker & Garwood, Finley, Knight & Harris* and *Walter H. Walne,* for appellee.

RAINEY, CHIEF JUSTICE.—R. L. Chambers sued the street railway company for the injury to one horse and the expenses of doctoring same, etc. The railway company plead the general issue and contributory negligence. Upon the trial the court instructed a verdict for the railway company and Chambers appeals.

The only question is, Does the evidence conclusively show that plaintiff was guilty of contributory negligence that contributed to the injury? The evidence shows that the railway company operates a double-track street railway line along Live Oak Street in the city of Dallas, which runs practically east and west and crosses Hawkins Street at right angles. Chambers was traveling horseback along Hawkins Street one dark night about 9:30 o'clock, going north, and when he reached the south track of appellee a car collided with his horse and injured him.

Chambers testified: "When I rode up near where Live Oak crossed Hawkins Street it was after dark, and I saw no light around there; to the east the houses set back from the street, and I saw a car coming west on Live Oak Street on the north track, running toward town; this car was ringing its gong and I stopped before reaching Live Oak Street and waited for it to pass. I watched this car running west until it had passed across Hawkins Street, and the street was clear for me to pass across Live Oak Street, north on Hawkins Street. There was a double track on Live Oak Street where it crosses Hawkins Street, and the car going west was on the north track and the south track was between me and the car that passed going west. I had stopped my horse several feet from the south track, and Buell's mill is close to the south track, and from where I stopped it obstructed my view from seeing a car running east on the south track, approaching Hawkins Street; as soon as the car going west had passed and the road was clear I started my horse to cross Live Oak Street going north on Hawkins Street, and just as I got on the south track one of the defendant's cars going east on the south track, coming from town, hit me and my horse. I did not see the car until it was right on me; it did not ring its bell, and it had no headlight on the car that I could see; the car was running rapidly, and when I first saw it it was too late for me to get off of the track, and the car struck me and knocked me and horse down and knocked and dragged us along the rails, knocked the glass out of the vestibule of the front of the car, the horse was rendered worthless by being injured in this collision; his market value before his injury was $65. With reference to why it was that I got on the track when the car was coming down there, and why I let the car run into me, will state that after the car going west toward town passed, I watched it until it passed the crossing, then I started across the track; I did not see anything to keep me from it in the way of a car or anything else. Buell's planing mill was there on the corner west of where I stopped while the car was going west in

passing.   There was a buggy with two negro women and a man in it, and they stopped there between myself and Buell's planing mill, going in the same direction that I was going.   I was closer to the south track on Live Oak Street than the buggy was, and as soon as this car running west passed I started across the track; at the time we started across the negro's horse and mine were right along together, his horse being on my left and at the time that I got in the middle of this south track here, this car came from behind this building here, and I did not see it until it was right on me, and did not hear this car going east until it was right on me.   I had my eye on the car going west coming to town until it had passed the crossing; when I first discovered the car that struck me it was within eight or ten feet of me; I reined in my horse but it was too late for me to get out of the way before the car struck me.   It is a little down grade on Live Oak Street from the H. & T. C. Railroad track to Hawkins Street; Buell's planing mill is ten or fifteen feet high at the corner, and further down Live Oak Street it is several stories high.   The south track on Live Oak Street is about eleven feet from the curbing and seventeen feet from the corner of Buell's planing mill building.   I watched the car going west on the north track on Live Oak Street until it had crossed Hawkins° Street.   I did not watch the car after it had cleared the crossing and passed Hawkins Street.   I did not look down the south track to see if a car was coming east on Live Oak Street or do anything to discover the car running east on the south track that struck me.   I had nothing to attract my attention to the car and I never thought about it.   I did not see or hear the car running east on Live Oak Street that struck me until it was within a few feet of me.   I never thought anything about the car running east until it was right on me and it was then too late for me to get off of the track with my horse.   The car was dark and was not ringing its gong before it struck me.   I depended upon the car to ring its gong and have a signal light on it.   I do not know how far north on Hawkins Street I would have to get before I could have seen the car if I had been standing looking for it.   I was so far back of Buell's planing mill when I stopped my horse for the car going to town to pass that I did not see the car that struck me coming, and the first I saw of it was after I started north on Hawkins Street and gotten on the track.   I do not know where I was looking after I took my eyes off of the car running west on Live Oak Street.   I started my horse after the car going west had passed Hawkins Street—just looking around in a general and in no way particular.   I do not know where I was looking before I saw the car right on me.   I have had other damage suits against this street car company that happened similar to this one.   I have been drunk several times in my life.   I do not know whether I signed a statement for you; that looks something like my signature.   You were out to my house the next day after this accident occurred and I was in bed injured at that time.   If you read that statement to me and I signed it I do not remember it.   I know that there is a double track along Live Oak Street where it intersects with Hawkins Street, and know that cars pass along there going in both directions every once in a while.   I have examined the

plat offered in evidence, and so far as I know the distances and location of the property lines and curb lines thereon are correct. When I started to cross the first track after the westbound car had passed, I did nothing affirmatively myself to ascertain whether a car was approaching from the west on the south track, but relied on the motorman in charge of the car to do his duty and warn me of the approach of his car by sounding the gong and having his headlight burning."

McKain testified: "I was out riding with a couple of girls and it was something like nine o'clock; it was after dark and we were driving north on Hawkins Street, and just about the time we got to Marandy Street that fellow rode out from the Peerless Laundry barns and he caught up with us, and we rode along there nearly side by side until the time we got to Live Oak Street; on Hawkins and Live Oak Street a westbound car on the north side of the street was coming west, and we stopped for it to pass. I had a very slow horse, and one of the girls in the buggy with me had the lines in her hands, and after the time that this car cleared the crossing, why we started up, and this fellow Chambers started his horse, too, and his horse being faster than my horse, and he started first, and there was a little building there on the corner, and like this is the street here, and this is the corner, this building blocks the street, and this Chambers man after the time that this car passes, and me having a slow horse, I did not get off in time, and this man Chambers was on the east side of the street, and we were on the west side of the street at the time we drove up there and stopped for this car to pass us, and I was closest to the car, but I did not hear any gong or anything to indicate that the car was coming, and so when this man Chambers started on, why, just as he got in the center of the track, this car run into him and his horse. When we drove up there and stopped for this westbound car to pass us, we were standing there nearly side by side, and after we started on across the track we did not see any reflection or anything else to indicate that this car was coming, and after the time that we had started across the track, after the westbound car had passed us, his horse being faster than my horse, he got the blow and I did not. I could see this car running west on the north track a good ways, on account of the residences set back from the street, but on this corner on our left—on the southwest corner, with that building there like it is—after the time that you have started your horse across that track there, you have either got to throw him down or he has got to be mighty slow, or you can not stop him before you get on the track there."

The city ordinance provides that operators of cars shall keep a vigilant watch for persons and vehicles, whether on or approaching the track, and that cars shall, after sunset, be provided with signal lights.

It appears that a man standing in the center of Hawkins Street at a point seventeen feet south of the first rail of the south track has an unobstructed view in daylight of over one thousand feet west on Live Oak Street, the direction from which the car that collided with plaintiff's horse approached the scene of the accident.

When all the facts and circumstances are considered, we are of the opinion the court erred in instructing a verdict for the appellee. Ap-

pellant had stopped when he approached near the track to allow a car going west to pass. It was dark, no gong was sounded by the east-going car. The view on the left, the way from which the car was coming, was obstructed, and whether or not on the passing of the westbound car, and with the other conditions then existing, the act of appellant in going on the track in an effort to cross was the act of an ordinarily prudent person was a question that should have been submitted to the jury for their determination.

The case of International & G. N. Ry. v. Edwards (100 Texas, 22), cited by appellee, we do not think precisely in point. In that case the facts show beyond question that Edwards was guilty of contributory negligence. No fact was stated that in the least tended to excuse him for the failure to use ordinary care. Justice Williams says in that case that the facts establish that no care whatever was taken and no excuse offered for its absence.

In this case an excuse is offered which we think sufficient to be submitted to the jury for their determination. The judgment is reversed and cause remanded.

*Reversed and remanded.*