**WICHITA VALLEY RY. CO. et al. v. TURBEVILLE et al.   (No. 10881.)**

(Court of Civil Appeals of Texas. Fort Worth. Dec. 6, 1924. Rehearing Denied Jan. 10, 1925.)

**1. Trial ⬤351(5)—Special issue as to weakness of particular cattle, in addition to issue as to contributory negligence in shipping in weakened condition, not proper.**

In action against carriers for damages to cattle during transportation, where special issue as to contributory negligence in shipping cattle while so poor and thin as to be unable to withstand shipment without injury, is submitted, it would be improper to submit separate issue as to weakness of cows that were calving, springers, and nursing calves.

**2. Trial ⬤352(4)—Plea of contributory negligence held sufficient to warrant special issues.**

In action against carriers for damages to cattle during transportation, plea of contributory negligence, though in general terms, held sufficient basis for submission of special issues as to contributory negligence in shipping cattle in weak condition, and immediately after dipping, in absence of special exception.

**3. Carriers ⬤217(1)—Contributory negligence of shipper of cattle not bar to recovery, if damages therefrom separable from those resulting from carrier's negligence.**

Alleged contributory negligence of shipper in shipping cattle immediately after dipping, and while they were in poor condition, is no bar to recovery of damages resulting from carrier's negligent handling of cattle, if the respective damages can be separated, but if not, it will bar recovery.

**4. Trial ⬤350(7)—Refusal to submit special issues as to contributory negligence in shipping cattle immediately after dipping, and while in poor condition, held error.**

Refusal to submit requested special issues as to shipper's negligence in shipping cattle immediately after dipping, and while they were in poor condition, and whether damages resulting from carrier's alleged negligence could be separated from that resulting from shipper's contributory negligence, held error.

**5. Carriers ⬤229(2)—Measure of damages for cattle dying in transit is market value at destination, if properly handled, less freight charges.**

The measure of damages for cattle dying in transit is price cattle would have brought in market upon arrival at destination, if properly handled by carrier, less freight charges paid by shipper.

**6. Carriers ⬤229(2)—Measure of damages for injury to cattle in transit is difference between value as injured, and value if properly handled.**

The measure of damages for injury to cattle resulting from negligence of carrier is difference between their market value at time of arrival at destination, and market value at

---

⬤For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

same time and place if they had been properly handled.

**7. Carriers ⬗230(12)—Instruction that measure of damages for death of cattle in transit is intrinsic value at destination on day shipped, held erroneous.**

Instruction that measure of damages for cattle that died as result of carrier's negligence was their intrinsic value at destination on day cattle were shipped, *held* erroneous, where it was not shown that cattle had no market value, and only proof of intrinsic value was incompetent testimony of shipper.

**8. Evidence ⬗472(2)—Testimony of shipper as to value of cattle injured in transit held inadmissible as conclusion.**

Testimony of shipper of cattle as to intrinsic value of cattle, based on his opinion as to their value if properly handled, *held* inadmissible as conclusion, since it left witness to determine for himself what degree of care carrier owed to shipper.

**9. Evidence ⬗472(11)—Opinions of shipper's employés that injury resulted from rough handling between certain stations held inadmissible.**

Where shipper suing for injury to cattle during transit based recovery solely on alleged rough handling between two certain stations, opinions of plaintiff's employés accompanying shipment that injury to cattle was due to rough handling between such two stations, should not have been admitted.

Appeal from District Court, Baylor County; J. H. Milam, Judge.

Action by J. H. Turbeville and others against the Wichita Valley Railway Company and others. Judgment for plaintiffs, and defendants appeal. Reversed and remanded.

Dickson & Newton, of Seymour, and Thompson, Barwise & Wharton and F. B. Walker, all of Fort Worth, for appellants.

J. A. Wheat, of Seymour, Kay, Akin & Kenley, of Wichita Falls, and Theodore Mack, of Fort Worth, for appellees.

DUNKLIN, J. A shipment of cattle was made by John Turbeville from a station called Cæsar, some two or three miles from the town of Kingsville, Tex., to the town of Fulda, Tex. The shipment was handled by the St. Louis, Brownsville & Mexico Railway Company from Cæsar to Odem; by the San Antonio, Uvalde & Gulf Railway Company from Odem to San Antonio; over the Missouri, Kansas & Texas Railway Company of Texas from San Antonio to Fort Worth; over the Fort Worth & Denver City Railway Company from Fort Worth to Wichita Falls, and from Wichita Falls to Fulda over the Wichita Valley Railway Company.

In the shipment that started from the initial point there were approximately 938 grown cows and 589 calves, and John Turbe-

ville owned one-half of them while his two step-sons, Sam and Claude Cowan, owned the other one-half; but the shipment was made by Turbeville acting alone. This suit was instituted by Turbeville alone against the receivers of the San Antonio, Uvalde & Gulf Railway Company and the Missouri, Kansas & Texas Railway Company, and all of the other railway companies mentioned, over which the shipment was made, to recover damages alleged to have resulted from rough and negligent handling of the cattle en route. The two Cowans intervened in the suit, and after they filed their petition of intervention, by amended petition they joined with Turbeville as coplaintiffs, and upon a trial of the case they recovered a judgment against all of the railway companies named, jointly, for the sum of $9,037, with interest. From that judgment all of the defendants have prosecuted this appeal.

The following were the only allegations of negligence relied on by plaintiffs as a basis for recovery:

"That, on that part of the trip between Kingsville, Tex., and Odem, Tex., and on the line of the St. Louis, Brownsville & Mexico Railway Company, the said cattle were improperly handled in this: That the agents, servants and employees of the railway company last named negligently by rough handling of the train and violent jerking, starting, checking, and stopping of the train and the cars, thereby causing the cars to strike each other, violently throwing the cattle about in the said cars, and piling them up in the ends of the cars, and causing said cattle to strike against each other, and against the walls, floor, and other parts of said cars, and thereby causing the damage and injury hereinafter set forth."

Then follow allegations to the effect that, as a result of the negligence complained of, 180 head of the grown cattle were killed, the intrinsic value of which upon their arrival at Fulda would have been $40 a head, if they had been properly transported; that the remainder of said grown cattle were so bruised and injured that their value was depreciated in the aggregate sum of $7,500; that 250 calves were killed of the value of $4,500; and that, by reason of injuries to the cattle which did not die, it became necessary to delay the shipment at San Antonio for a period of 10 days in order for them to recuperate sufficiently to continue the trip, during which time plaintiffs were compelled to incur a bill for feed in the sum of $1,600.

It was further alleged that the initial carrier, acting for itself and for all of the other defendants, undertook and agreed to transport the cattle from Cæsar to Fulda, and that it had authority from the other defendants to make said contract, and that the contract was ratified and approved by the other defendants by sharing each with all the others the $2,960, which plaintiffs paid to the in-

---

⬗For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

itial carrier as freight for the entire trip, and that the contract of shipment made by the initial carrier was further ratified and approved by each of the other defendants by accepting the shipment as it reached each particular line of railway.

In addition to general and special exceptions to the petition, the defendants pleaded a general denial, and their answers also contained the following special plea:

"Further answering herein, if required, and by way of special answer, these defendants, and each of them, say that the plaintiff is not entitled to recover herein for the reason that he, his agents, servants, and employés, and those for whose acts he is responsible herein, were guilty of negligence on their part proximately causing and contributing to such damages as the plaintiff may have sustained herein."

The answer also contained a plea for general relief under the law and facts of the case. The case was submitted to the jury on special issues, in answer to which the jury found: (1) That the defendant, St. Louis, Brownsville & Mexico Railway Company was guilty of negligence as alleged in plaintiffs' petition, in transporting the cattle from Kingsville to Odem. (2) That such negligence was the proximate cause of the death of 158 cows and 133 calves; that the intrinsic value of the cows that died was $22.50 per head, and that of the calves $10 per head. (3) That the negligence so found was also the proximate cause of injuries to the cattle that did not die, by reason of which plaintiffs sustained damages in the sum of $2,552. The foregoing issues were submitted by the court in his main charge.

The following findings were made by the jury upon issues submitted at the request of defendants: (1) That some of the cattle shipped were "calving, springers or nursing young calves," but that the injuries sustained by them were not "caused as the sole, direct, and approximate result" of that condition. (2) That the cattle were loaded after being dipped, but that the damage they sustained was not "caused solely, directly, and approximately" by reason of that fact. (3) That, at the time the cattle were delivered to the St. Louis, Brownsville & Mexico Railway Company, they were in a poor and weak condition, but that the damage sustained was not "caused as the sole, proximate cause of that condition."

[1] We have reached the conclusion that the court erred in refusing to submit to the jury further special issues requested by the defendants, presenting the defenses of alleged contributory negligence on the part of the plaintiffs in shipping the cattle immediately after they were dipped, and before the dipping solution remaining on them had dried; and in shipping them while they were so poor and thin as to be unable to withstand ship-

ment without injury, even if transported with ordinary care and reasonable dispatch; and also whether or not the jury was able to determine and separate damages resulting from injuries sustained by the cattle by reason of the alleged negligence of the defendants in transporting them, from damages resulting from the alleged contributory negligence on the part of the plaintiffs, if any. But since the thin and weak condition of the cattle would include weakness of the cows that were "calving, springers or nursing calves," it would be improper to make such condition of those cows the basis of a separate and distinct issue, in addition to the general issue of weakened condition of all the cattle.

Under quarantine regulations of the government, cattle in the portion of the state from which those in controversy were shipped were required to be dipped in an arsenical solution, in order to destroy what is known as tick fever, and the proof showed that, in compliance with those regulations, plaintiffs' cattle had been dipped several times prior to their shipment, the last time being after they were placed in the cattle pens at Cæsar for shipment. And there was evidence tending to show that plaintiffs had them loaded in the cars immediately after they were dipped the last time, and before the solution had dried on them; and that at the time the cattle were loaded the temperature of the weather was approximately 78 or 80 degrees. According to the testimony of other witnesses introduced by the defendants, who had had considerable experience in shipping cattle, the loading of cattle after being dipped, and before the solution upon them becomes dry, will cause a considerable rise in the temperature of the animals which will tend to injure them, and by reason of that fact it is not customary among cattle men to load them until after the dipping solution on them becomes dry.

J. W. Burby, a veterinarian, graduate of the Wellman Veterinary College, in the year 1891, who had practiced his profession as such ever since that year, and who was located in the city of San Antonio, testified that after the cattle in controversy reached San Antonio and were unloaded in the yards at that place, he examined them and found quite a number dead, and others that were down and unable to get up were hauled off and killed. He further testified that he made a post mortem examination of the carcasses of several of the cattle that died. He further testified that the cattle which did not die remained in the yards at San Antonio 12 days, and that he inspected them every day while there. He further testified that, in his opinion, after making a post mortem examination of a cow, he could tell from what the cow died; that the cattle that were dead upon arrival at San Antonio died

from suffocation of heat; that those that died in the pens after their arrival died from arsenic poisoning; that the poor and weak condition of the cattle in which he found them made them more susceptible to the poison, and that that was why some of the animals survived and some did not. He further testified:

"I attribute this suffocation that I spoke of to the fact that the animals were dipped or had been dipped some time. It puts the skin in a blister. Then where the radiation of the heat don't take place, the internal radiation of heat is not thrown off and after the animal is dipped there is a certain amount of moisture of this dip stays on them. A part will keep the moisture on them, if they are kept in a close place, or if they are kept in bunches, and the heat gets so intense that they will drop from suffocation."

Other testimony was introduced which tended to show that when the cattle were loaded on the cars at Cæsar they were so poor in flesh as to lack sufficient strength to withstand a shipment under ordinary circumstances, without injury.

[2] While contributory negligence on the part of plaintiffs was pleaded in general terms, that pleading furnished a sufficient basis for the submission of the special issues requested and refused, in the absence of any special exception to that plea on the ground that it was not sufficiently specific.

[3] Our conclusion is, that if the alleged negligence of the shippers, embraced in the special issues tendered and refused, had been found by the jury in connection with further findings that the same contributed with the defendants' negligence to cause the damages for which plaintiffs sued, then such contributory negligence would not bar a recovery for the damages resulting from the defendants' negligence, if such damages could be separated and distinguished from the damages resulting from plaintiffs' contributory negligence; but that if such separation of the damages cannot be made and determined by the jury, then plaintiffs' contributory negligence would bar a recovery for all damages resulting from such concurring negligence of the plaintiffs and defendants, the results of which cannot be separated and determined.

Upon elementary principles of equity, we perceive no reason why plaintiffs should not be held to the duty of exercising the same degree of care of the cattle in undertaking to ship them which they insist the defendants were required to exercise in transporting them. While it is true that injuries resulting from inherent vices of the animals, such as their weakened condition at the time they are tendered for shipment, are not recoverable in any event, yet, it is also true that, the weaker the cattle, the greater they will suffer from negligence of the carrier in transporting them. And if plaintiffs' cattle were so weak that a person of ordinary prudence, situated as were plaintiffs, would not, under the same circumstances, have undertaken to ship them while in that condition, and, if by reason of such unfit condition they sustained injuries from the alleged negligent rough handling by defendants, in express of what they would otherwise have suffered, and if damages for such excessive injuries alone cannot be determined and separated from those which would have been sustained by the cattle if they had not been in such unfit condition for shipment, then to allow a recovery of the entire damages would be to permit plaintiffs to profit by their own negligence. But that result would not follow if damages caused by the negligence of the defendants alone can be separated and determined, and a recovery allowed therefor. The same observations apply to the alleged contributory negligence of plaintiffs in shipping the cattle immediately after they were dipped. Such was the doctrine announced by this court in G., H. & S. A. Ry. Co. v. Crowley, 214 S. W. 721. See, also, St. L. S. W. Ry. v. Arey, 107 Tex. 366, 179 S. W. 860, L. R. A. 1916B, 1065; Midland Ry. v. Monroe, 110 Tex. 103, 216 S. W. 388; I. & G. N. Ry. v. Drought & Co. (Tex. Civ. App.) 100 S. W. 1011; Massey v. T. & P. Ry. (Tex. Civ. App.) 200 S. W. 409; T. & P. Ry. v. Edins, 36 Tex. Civ. App. 639, 83 S. W. 253; K. C. Mo. Ry. v. McCunningham (Tex. Civ. App.) 149 S. W. 420; Fort W. & D. C. Ry. v. Fort Worth Horse & Mule Co. (Tex. Civ. App.) 180 S. W. 1170.

Appellees have cited Hartford Fire Ins. Co. v. G. H. & S. A. Ry. Co., 239 S. W. 919, by the Commission of Appeals, in support of their contention that the alleged contributory negligence on the part of the shipper is not a defense in whole or in part in this suit for damages resulting from the negligence of the carrier. But we think the opinion in that case supports our conclusion, and in it the Crowley Case above noted was cited with approval. In the Hartford Fire Insurance Case, in discussing the defense of contributory negligence in shipping cattle in a weakened condition, the court said:

"While the railway company was not in any way responsible for such condition, its duty to exercise ordinary care in transporting the several shipments was not abrogated thereby. Such weak and impoverished condition of the cattle, however, constituted an inherent vice or defect, a want of vitality, and for any injury or damage resulting therefrom it is not liable. 10 C. J. pp. 123–125, §§ 151–153, inclusive, and notes. The railway company is liable, however, for all damages to such class of cattle as directly and proximately resulted from its own negligence and the negligence of its connecting carriers, and such damages only were authorized to be recovered by the charges under consideration."

But the court further said:

"We cannot say as a matter of law that such negligence of shippers and caretakers existed, or, if it did exist, that it caused or contributed to the entire damage sued for. Though there may have been negligence on the part of the shippers and caretakers in the matters above recited, such negligence would only preclude a recovery for injuries or damage resulting therefrom in whole or in part. It would not preclude a recovery of other damages caused by the negligence of the carriers and not proximately contributed to thereby. M., K. & T. Ry. Co. v. Chittim, 24 Tex. Civ. App. 599, 60 S. W. 284, 286 (writ refused); G. H. & S. A. Ry. Co. v. Crowley (Tex. Civ. App.) 214 S. W. 721, 724. The assignments under consideration are overruled. The case will, however, be reversed on other grounds, and, if the issue of contributory negligence is raised by the evidence on another trial, the court should, if requested, give a proper charge thereon in accordance with the rule announced in the authorities above cited."

Other authorities cited by appellees on the same question have been examined, but we do not think they are in point, and therefore they will not be discussed.

[4] While the testimony of plaintiffs in the case tended strongly to show that all of the injuries suffered by the cattle resulted from rough handling alone, and while the charge given by the court submitted the specific issue of damages resulting solely from the negligence of defendants, yet, in view of the testimony introduced by the defendants noted above, and other testimony shown in the record tending to support the defenses embraced in the requested issues tendered and refused, the defendants had the right to an affirmative presentation of those defenses, even though the jury was instructed to limit their findings of damages to those resulting from the negligence of defendants alone. See M., K. & T. Ry. v. McGlamory, 89 Tex. 635, 35 S. W. 1058; St. L. S. W. Ry. v. Hall, 98 Tex. 480, 85 S. W. 786; Wichita Falls Traction Co. v. Adams, 107 Tex. 612, 183 S. W. 155; Gammage v. Gamer Co. (Tex. Com. App.) 213 S. W. 930; Olds Motor Works v. Churchill (Tex. Civ. App.) 175 'S. W. 785.

[5, 6] If plaintiffs are entitled to recover damages for the loss of the cattle which died in transit, then, the measure of those damages would be the price that those cattle would have brought in the market at Fulda, upon their arrival there, in the condition they would have been in had the defendants shipped them with ordinary care and reasonable dispatch, less the freight charges paid by plaintiffs for shipping them. The measure of damages for injuries to the remainder of the cattle, resulting from the negligence of the defendants, would be the difference in their market value in the condition and at the time they arrived in Fulda, and what would have been their market value at the same time and place, if they

had been handled with ordinary care, and transported within a reasonable time. M. P. Ry. v. Fagan, 72 Tex. 127, 9 S. W. 749, 2 L. R. A. 75, 13 Am. St. Rep. 776; G., C. & S. F. Ry. v. Stanley, 89 Tex. 42, 33 S. W. 109.

[7] In the court's charge the jury was told, in effect, that the measure of plaintiffs' damages for the cattle that died as the result of the defendants' negligence would be what would have been their "intrinsic value" at Fulda, on April 15, 1922, which was the date on which they started on the journey at Cæsar. Manifestly, that instruction was contrary to the well-established rule for measuring such damages, which is stated above.

According to another rule of decisions, the intrinsic value of the cattle could not be a proper basis for measuring such damages unless it be shown that the cattle had no market value. S. K. R. Co. v. Hughey (Tex. Civ. App.) 182 S. W. 361; G., C. & S. F. Ry. v. Peacock, 60 Tex. Civ. App. 250, 128 S. W. 463; Ft. Worth & D. C. R. Co. v. Harle (Tex. Civ. App.) 240 S. W. 1004. And further complaint is made of the charge given by the court, already noted, in that it did not require a finding by the jury that those cattle had no market value, before their intrinsic value could be considered.

[8] The only proof offered even of intrinsic value was the testimony of plaintiff Turbeville, who based his opinion solely on what, in his opinion, such value would have been, "if they had reached there in an uninjured condition, if they had been handled as they should have been handled." And that testimony was inadmissible because it embodied a conclusion of the witness which he was not legally qualified to give. Houston & T. C. R. Co. v. Roberts, 101 Tex. 418, 108 S. W. 808. The testimony does not come within the rule of decision in T. & P. Ry. v. Prunty, 111 Tex. 162, 230 S. W. 396, since the witness was left to determine for himself what degree of care defendants owed to plaintiffs, without even stating whether that was ordinary care or otherwise. The incompetency of that testimony is made a further ground of complaint of the court's charge on the measure of damages. And for lack of proper proof of such damages, appellants contend that judgment should be here rendered in their favor, since they requested of the trial court an instructed verdict to that effect, although they did not present those reasons as grounds for such request, nor object to proof of intrinsic value until proof made of no market value, nor except to the petition for failure to allege that predicate for proof of intrinsic value.

[9] Plaintiffs' witnesses, Bauchman, Hull, and Wright, were permitted, over defendants' objection, to testify that the injured condition of the cattle was, in their opinion, due to rough handling between Kingsville

and Odem. The objection urged to the testimony was that it called for the opinion of the witnesses on an issue, the determination ·of which was within the exclusive province of the jury. Those witnesses were plaintiffs' employés accompanying the shipment, and although they testified strongly and specifically to extremely rough handling between Kingsville and Odem, and although they were experienced in handling shipments of cattle, we yet think that the objection should have been sustained; the charge of rough handling between those two stations being the sole basis for plaintiffs' recovery, according to their petition. G. H. & S. A. Ry. v. Vogt (Tex. Civ. App.) 181 S. W. 848; T. & P. Ry. v. Lee, 21 Tex. Civ. App. 174, 51 S. W. 351; 57 S. W. 573; Hodges v. Swastika Oil Co. (Tex. Civ. App.) 185 S. W. 370; Lunsden v. Jones (Tex. Civ. App.) 205 S. W. 375; Reast v. Donald, 84 Tex. 648, 19 S. W. 795.

For the errors pointed out, the judgment is reversed and the cause remanded.